UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES and STATE OF NEW YORK ex rel. JOHN DOE and JANE ROE,

    Plaintiffs,

    v.

MOUNT SINAI HOSPITAL, MOUNT SINAI SCHOOL OF MEDICINE, and MOUNT SINAI RADIOLOGY ASSOCIATES,

    Defendants.

13 CV ____

Filed under seal pursuant to 31 U.S.C. § 3730(b)(2)

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.    This is a civil action by Relators John Doe and Mary Roe (whose identities have been separately disclosed to the United States and the State of New York) ("Relators") on their own behalf and on behalf of the United States and the State of New York against Defendants Mount Sinai Hospital ("MSH"), Mount Sinai School of Medicine ("MSSM"), and Mount Sinai Radiology Associates ("MSRA") ("Defendants") under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 et seq. ("FCA") and the New York State False Claims Act, N.Y. State Finance Law §§ 187 et seq. ("NYSFCA") for damages and multiples, civil penalties, and other relief arising from fraud committed by the Defendants against the Medicare Program and the Medicaid Program in New York.

**NATURE AND OVERVIEW OF THE ACTION**

2.    As set forth more fully below, in violation of the FCA and the NYSFCA, the Defendants' fraudulent schemes included: (a) replacing on billing documents the name of an ineligible doctor who performed a service with that of a doctor participating in Medicare or Medicaid ("doctor swapping"); (b) overstating diagnoses and procedure codes ("upcoding"); (c) billing for services that were not performed ("phantom billing");  billing more than once for

the same service ("double billing"); and (e) in many instances, committing more than one of the foregoing violations with respect to billing for a single patient or service ("multiple fraud").

**JURISDICTION**

3.	The court has subject matter jurisdiction over the federal claims alleged in this Complaint under 31 U.S.C. § 3732(a) (False Claims Act), 28 U.S.C. § 1331 (federal question), and § 1345 (United States as plaintiff).  Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over state claims arising from the same transaction or occurrence as an action under the federal FCA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

4.	The court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found, reside, and transact business in the Southern District of New York and because an act proscribed by 31 U.S.C. § 3729 occurred within this district.  Section 3732(a) further provides for nationwide service of process.

**VENUE**

5.	Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a) in that the Defendants reside and transact business, and a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in this complaint occurred, in this district.

**PARTIES, ENTITIES, AND INDIVIDUALS**

6.	The United States, through its agency, the United States Department of Health and Human Services ("HHS"), and the State of New York, through its Department of Health, are the real parties in interest in this action.  HHS is located at 200 Independence Avenue, SW, Washington, DC 20201.  Within HHS, the Centers for Medicare and Medicaid Services (CMS)

administers and funds the Medicare and Medicaid programs. CMS is located at 7500 Security Boulevard, Baltimore, Maryland, 21244-1850.

7. Together with the State of New York and the City of New York, HHS funds the Medicaid Program covering New York City beneficiaries and providers.

8. The New York Department of Health (NYDOH) is responsible for administering the New York Medicaid Program. It does this through its Office of Health Insurance Programs, located at Corning Tower, Empire State Plaza, Albany, NY 12237.

9. The Relators are residents of New York, New York. At relevant times, relator Doe was employed by MSH; and relator Roe was and is employed by MSH.

10. Defendant MSH is a not-for-profit hospital corporation licensed by the New York State Department of Health to operate in New York, with headquarters in Manhattan at One Gustave L. Levy Place, New York, New York 10029.

11. Defendant MSSM is a medical school organized under the New York Education Law and was chartered by the Board of Regents 1963, with headquarters at 1176 Fifth Avenue in New York, New York. MSH and MSSM together are known as the Mount Sinai Medical Center.

12. Defendant MSRA is a private practice group affiliated with the hospital and medical school with headquarters at 1176 Fifth Avenue, New York, New York 10029.

13. Mount Sinai Faculty Practice Associates ("MSFPA") consists of physicians and surgeons who are full-time faculty members of MSSM and also hold staff privileges at MSH. MSFPA offices are located at 5 East 98th Street, New York, New York. Many if not all MSRA physicians are members of both MSFPA and the MSH Department of Radiology.

14.     Medical specialty areas at Mt. Sinai—for example, surgery, pediatrics, and radiology—each had their own billing department.  The Radiology Billing Department handled billing for radiology services in the MSH Department of Radiology, the MSH Nuclear Medicine Department, and MSRA.

15.     At relevant times, Daniel Dorce and John W. Hart were employees of MSH and were directors of the Radiology Billing Department.  Hart and Dorce reported in turn to the chairman of the MSH Radiology Department.   Hart is currently the Director of MSSM.

16.     At relevant times, Dr. Mathew Lefkowitz, and subsequently Dr. Burton Drayer, was the chairman of the MSH Radiology Department.

17.     Hart and Dorce instructed Radiology Billing Department employees, including the Relators, to falsify and submit patient medical and billing records in order to obtain Medicare and Medicaid, as well as and private insurance, reimbursement that Mt. Sinai was not entitled to receive.

**FCA JURISDICTIONAL BARS**

18.     Upon information and belief, none of the jurisdictional bars set forth in the FCA, 31 U.S.C. § 3730(e), and in the NYSFCA, N.Y. State Fin. Law §190(9) is applicable to this action.

19.     Each relator is an original source of the information on which his or her allegations are based within the meaning of the FCA and the NYSFCA.

**MEDICARE AND MEDICAID**

20.     Medicare, enacted in 1965 under Title XVIII of the Social Security Act, is a third party reimbursement program that underwrites medical expenses of the elderly and the disabled.

42 U.S.C.§§ 1395 et seq.  Medicare reimbursements are paid from the federal Supplementary Medical Insurance Trust Fund.  Medicare Part A covers hospital services; Part B generally covers physicians' services, including medical and surgical treatment and outpatient treatment and diagnosis.  Part B, 42 U.S.C. §§ 1395j et seq.; 1395l (payment of benefits).  Many if not most or all of the false claims in issue in this case arise under Part B.

21.     Medicaid, enacted in 1965 under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., is a medical assistance program for indigent and other needy people that is financed by joint Federal and State funding and is administered by the States according to federal regulations, oversight, and enforcement.  Each State implements its version of Medicaid according to a State Plan that has been approved by HHS.  Within broad Federal regulatory and policy guidelines (42 C.F.R. § 430 et seq., and CMS publications), the states determine who is Medicaid-eligible, what services are covered, and how much to reimburse health care providers.  The states, through intermediaries, also receive provider claims for program reimbursements, evaluate those claims, make payments to the providers, and present the claims to HHS for reimbursement of the Government's share.

**FALSE CLAIMS ACTS**

22.     For purposes of the FCA, "claim" means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that  (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or  (II) will reimburse such contractor, grantee, or other recipient for any

portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2)(A) (as amended May 20, 2009; the prior version is materially identical for purposes of this action).  For purposes of the NYSFCA,  "claim" means any request or demand, whether under a contract or otherwise, for money or property that (i) is presented to an officer, employee or agent of the state or a local government; or  (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  N.Y. State Fin. Law § 188(1)(a).

23. For purposes of the FCA and the NYSFCA, "knowing" and "knowingly" mean that a person, with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.  31 U.S.C. § 3829(b) (as amended May 20, 2009; the prior version is materially identical); N.Y. State Fin. Law § 188(3)(a).

24. For purposes of the FCA and the NYSFCA, "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4) (as amended May 20, 2009; and prior case law); N.Y. State Fin. Law § 188(5).

25. The Patient Protection and Affordable Care Act, P.L. 111-148, 124 Stat. 119 (March 23, 2010) makes the failure to reimburse Medicare or Medicaid for an overpayment within 60 days a statutory reverse false claims violation.  Under 42 U.S.C. § 1320a-7k(d), the

failure to timely return an overpayment is an "obligation" to the government within the meaning of 31 U.S.C. § 3729(b)(3) of the False Claims Act.  Recipients of an overpayment from Medicare and Medicaid must report it and return the overpayment by 60 days from when it was identified, or the date any corresponding cost report is due, whichever is later.

### BILLING PROCEDURES AND CLAIMS FOR MEDICARE AND MEDICAID PAYMENT

26.     The bills electronically submitted to Medicare and Medicaid are the "claims" at issue for purposes of the FCA and NYSFCA.

27.     Providers, such as MSH, MSSM, and MSRA submit claims to Medicare by billing a carrier or a Medicare Administrative Contractor (MAC), which process the claims on behalf of HHS.  National Government Services, Inc. is currently and was at relevant times the Medicare Administrative Contractor for Part A and Part B claims ("A/B MAC") for covered services in New York (and certain neighboring areas).

28.     Providers that submit claims electronically to CMS or to CMS contractors, including A/B MACs, must certify in their application that, among other things, they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law."  See Medicare Claims Processing Manual, § 30.2.A.

29.     Medicaid claims are also submitted primarily electronically.  The eMedNY system, operated by Computer Sciences Corporation at a facility in Rensselaer, New York under

contract with NYDOH, is currently and was at relevant times the Medicaid claims processing agent for the New York State Medicaid program.

30.     Providers that submit claims to the New York State Medicaid program must certify, among other things, that all statements in the claim made are true, accurate and complete to the best of the provider's knowledge; that no material fact has been omitted; that the provider is bound by all rules, regulations, policies, standards, fee codes and procedures of the NYDOH as set forth in Title 18 of the Official Compilation of Codes, Rules and Regulations of New York State and other publications of the Department, including Provider Manuals and other official bulletins of the Department; and that the certifications are true.  See New York State Medicaid Program:  Information For All Providers—General Billing (current version at https://www.emedny.org/ProviderManuals/AllProviders/PDFS/archive/Information_for_All_Providers-General_Billing-2004-01.pdf).

**APPLICABLE BILLING LAWS, REGULATIONS, AND POLICIES**

**Doctor swapping**

31.     Physicians, non-physician practitioners, and other health care suppliers must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries.  42 C.F.R. § 424.505.

32.     Medicare enrollment and reimbursement is limited to physicians who meet the requirements of the federal and state licensing, certification, and regulatory requirements applicable to the type of services which they furnish and for which they bill Medicare.  42 C.F.R. § 424.516(a)(2).

33.     Physicians who enroll in Medicare may sign a Participation ("PAR") Agreement, whereby they accept assignment of Medicare's allowed charge as payment in full for all covered

services they provide to Medicare patients.  Alternatively, physicians who enroll in Medicare may choose to be "non-PAR."  The Medicare fee schedule for non-PAR physicians is 5% lower than for PAR physicians.   42 U.S.C. § 1395w-4(a)(3); 42 C.F.R. 414.20(b); CMS-460, Medicare Participating Physician or Suppler Agreement.

34. Physicians may also opt out of Medicare, and privately contract with patients, including Medicare beneficiaries.  An opt-out physician contract with a Medicare beneficiary must stipulate (among other conditions) that that the beneficiary will not bill Medicare or ask the physician to bill Medicare, and that Medicare does not pay for the services.  Physicians who opt out must certify by affidavit that they agree to forgo receiving any Medicare reimbursement for services provided to Medicare beneficiaries for a period of two years.

35. Medical practices, clinics, and hospital departments that bill Medicare for Part A or Part B services must certify they will abide by applicable Medicare laws, regulations, and program instructions, and certify their understanding that payment of a claim by Medicare is conditioned on the claim and the underlying transaction complying with such laws, regulations, and program instructions.  They must also agree that they will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or deliberate disregard of their truth or falsity.  See CMS-855B, Enrollment Application for Clinics/Group Practices and Certain Other Suppliers, § 15, "Certification Statement," ¶¶ 3, 6.

36. Medicare may reject a claim for various reasons.  Medicare (and private insurers) utilize a standard, coded list of reasons for rejecting claims.  Examples are rejection codes MC-B7, "This provider was not certified/eligible to be paid for this procedure/service on this date of service"; MC-16, "Claim/service lacks information which is needed for adjudication.  Additional

information is supplied using remittance advice codes whenever appropriate"; and MC-45, "Charges exceed your contracted/legislated fee arrangement."

37. As a condition of payment by the New York State Medicaid program, every participant and beneficiary in the Medicaid Program is subject to 18 NYCRR § 515.5, which makes compliance with all conditions of participation in the program a condition of payment for any good or service furnished under the program. That provision provides, in pertinent part: "(a) No payments will be made to or on behalf of any person for the medical care, services or supplies furnished . . . in violation of any condition of participation in the program . . . . (b) No payment will be made . . . for any medical care, services or supplies ordered or prescribed in violation of any condition of participation in the program." 18 NYCRR § 515.5 (emphasis added).

**Upcoding, phantom billing, and double billing**

38. Upcoding, phantom billing, and double billing are equally violative of the CMS-855B certifications required of medical practices, clinics, and hospital departments that bill Medicare.

**DEFENDANTS' FRAUDULENT SCHEMES**

39. From at least as early as 2006 to at least as late as 2010, Mt. Sinai routinely and knowingly submitted claims for Medicare reimbursement that were fraudulent in that they were based on doctor swapping, upcoding, phantom billing, double billing, or multiple instances of fraud. In some cases, a portion of the claim was paid by Medicaid.

40. Dorce and Hart instructed employees to engage in the fraudulent schemes in order to meet monthly billing quotas of $2.5 million or more.

41. Approximately 40% of Medicare billing and 50% of Medicaid billing by the Mount Sinai Radiology Billing Department was fraudulent.

42. In an internal investigation conducted by the Defendant Mount Sinai Hospital/s Audit Services and its Compliance personnel in or about September 2010, Radiology Billing Department employees admitted that they had engaged in to the fraudulent practices on instructions by Dorce, and they were asked to sign written statements concerning the fraud Nevertheless Bruce Sackman, one of the Audit Service officers, determined that the fraud was not to be reported to the government and that the hospital would not reimburse the government.

   **a. Doctor swapping**

43. To implement the doctor swapping scheme, Dorce regularly prepared and distributed lists with names of physicians who should or should not be used for billing purposes, according to whether the physicians were physicians participating in Medicare or Medicaid (and private insurance programs), to ensure that the payer was billed using a physician participating in the insurance program when in fact the service was performed by nonparticipating physician.

44. Such lists included "Insurance Participation Lists" with the names of "Do Not Use" doctors for New York Medicaid and "Medicaid HMO Provider Numbers", identifying physicians either by provider number or as "non-PAR" (non-participating).

45. As an example of doctor swapping, the medical record for patient A[1] contains narrative report of a CT neck with contrast performed by Dr. P. Pawha on May 28, 2010, and the report was signed by Dr. Pawha.  The record reflects that a claim was submitted identifying Dr. Pawha as the physician who performed the service; the claim was rejected on the ground that the

---

[1] To protect patients' identities, their names are not used in this complaint.  Medical and billing records provided to the government have been redacted.

physician was not certified/eligible to be paid for the service; the claim was resubmitted falsely identifying Dr. M. Sacher as the physician who performed the service; and a portion of the claim (subject to contract limits and patient responsibility) was subsequently paid by Medicare. (A portion of the claim was also paid by a private insurer).

46. As another example of doctor swapping. the medical record for patient B contains narrative report of a chest PA left lateral by Dr. H. Mitty on October 13, 2009, and the report was signed by Dr. Mitty. The invoice record for this service reflects that a claim was submitted identifying Dr. Mitty as the physician who performed the service; the claim was rejected on the ground that the claim lacked information needed; the claim was resubmitted falsely identifying Dr. E. Wilck as the as the physician who performed the service; and Medicare paid a portion of the claim.

47. Mount Sinai resubmitted rejected claims in an attempt to get them paid by Medicare. Many if not most or of the resubmitted claims included for the first time the radiologist's narrative report of the procedure. Billers in the Radiology Billing Department were instructed to forge physician signatures on these submitted reports. They did so by pasting a copy of the signature of a physician who participated in or was eligible for in Medicare payment when in fact the procedure was performed and the original report was signed by a nonparticipating or a non-certified or non-elegible physician.

**b. Upcoding**

48. As an example of upcoding, in the record for patient C, Dr. Wilck wrote a report of a CT of the chest, abdomen, and pelvis without contrast dated May 11, 2010. The service was billed as a CT scan "with and without contrast," and Medicare paid for it as such, when in fact it should have been billed as a noncontrast CT scan.

### c. Phantom billing

49. As an example of phantom billing, the invoice and invoice detail with respect to patient D state that Medicare paid $609.86 for a CT performed on October 18, 2010. However, the "Patient Exam List," which records all services performed for the patient, shows no services performed for Patient D on that date

### d. Double billing

50. As an example of double billing, in the case of patient E, Dr. Law performed an MRI of the brain without contrast on January 8; and an MRI of the cervical spine without contrast and an MRI of the thoracic spine without contrast on January 9, 2008. According to the Patient Exam List and physician reports, these three tests, and only these, were performed on Patient E those two dates. However, Mt. Sinai billed Medicare a total of $7,500 for these three tests as if all were performed on January 8, when in fact only the MRI of the brain was done on January 8. Medicare paid Mt. Sinai for these tests. Mt. Sinai also billed Medicare a total of $5,000 for the MRI of the cervical spine and the MRI of the thoracic spine under the date of January 9, 2009, and Medicare paid Mt. Sinai for these tests as well. As a result, Mt. Sinai double billed Medicare, and Medicare paid double, for the MRI of the cervical spine and for the MRI of the thoracic spine. In addition, Medicaid paid a portion of the charges for these tests.

### e. Multiple fraud

51. The billing in the case of patient E is an instance of doctor swapping as well as double billing, and is thus an instance of multiple fraud. According to the physician reports, the tests on January 8 and 9 were done by Dr. Law but are falsely recorded in the invoice records as being done by Dr. Delman. Dr. Delman was eligible for payment by Medicare; Dr. Law was not.

52. As another example of multiple fraud, the medical record for patient F is an instance of both upcoding and doctor swapping. Mt. Sinai billed, and Medicare paid, for two views of the chest, PA/AP and lateral, when in fact the physician's report, dated April 6, 2010, shows that only one view, PA/AP, was obtained. The report is signed by Dr. Mitty, who was not credentialed, but Mt. Sinai submitted a bill that falsely states that services on April 6, 2010 were rendered by Dr. Wilck, who was eligible for payment by Medicare.

**COUNT I**
**Federal False Claims Act Violations**
**31 U.S.C. § 3729(a)(1), (2) and (7)**

53. Relators reallege the above allegations as if set forth fully herein.

54. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, prior to the May 20, 2009 amendment.

55. Through the acts described above and otherwise, since approximately 2007 if not earlier, the Defendants, by and through their agents and employees: (i) knowingly presented, or caused to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; and (iii) knowingly made, used, or caused to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

56. On information and belief, the United States was unaware of the falsity of the records, statements, and claims made or submitted by the Defendants.

57. On information and belief, the false and fraudulent representations and claims made to the United States by the Defendants were material to the Government's decisions to make Medicare and Medicaid payments to the Defendants.

58. On information and belief, if the United States had known of the false or fraudulent nature of the Defendants' representations and claims, it would not have made the Medicare and Medicaid payments to the Defendants,

59. By reason of the Defendants' violations of the False Claims Act, the United States has suffered economic loss.

## COUNT II
### Federal False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(A), (B), and (G)

60. Relators reallege the above allegations as if set forth fully herein.

61. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended on May 20, 2009.

62. Through the acts described above and otherwise, the Defendants, by and through their agents and employees (i) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and (iii) knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

63. On information and belief, the United States was unaware of the falsity of the records, statements, and claims made or submitted by the Defendants.

64. On information and belief, the false and fraudulent representations and claims made to the United States by the Defendants were material to the Government's decisions to make Medicare and Medicaid payments to the Defendants.

65. On information and belief, if the United States had known of the false or fraudulent nature of the Defendants' representations and claims, it would not have made the Medicare and Medicaid payments to the Defendants.

66. By reason of the Defendants' violations of the False Claims Act, the United States has suffered economic loss.

### COUNT III
### New York False Claims Act Violations
### N.Y. Fin. Law § 189(1)(a), (b), and (f)

67. Relators reallege the above allegations as if set forth fully herein.

68. In connection with claims submitted to the New York Medicaid Program and the United States, since approximately 2007 if not earlier, Defendants (i) knowingly presented, or caused to be presented a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and (iii) knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the State of New York.

69. On information and belief, the State of New York has paid money to the Defendants upon the false, fictitious, or fraudulent claims described in this complaint and has thereby suffered damages.

70. On information and belief, if the State of New York had known of the falsity of the Defendants' claims, it would not have made the Medicaid payments to the Defendants.

71.     By reason of the Defendants' violations of the False Claims Act, the State of New York has suffered economic loss.

**DEMAND FOR RELIEF**

WHEREFOR, the Relators, on behalf of themselves individually, and acting on behalf and in the name of the United States and the State of New York, demand judgment against the Defendants as follows:

A. On Counts I and II,

(i) Directing that Defendants cease and desist from violating the FCA;

(ii) In the amount of three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each act in violation of the FCA, as provided by 31 U.S.C. § 3729(a), with interest;

(iii) Directing that the Relators be awarded the maximum amount available under 31 U.S.C. § 3730(d) for bringing this action, namely, twenty-five percent of the proceeds of the action or settlement of the claim if the United States intervenes in the matter (or pursues its claim through any alternate remedy available to the United States, 31 U.S.C. § 3730(c)(5)), or, alternatively, thirty percent of the proceeds of the action or settlement of the claim, if the United States declines to intervene;

(iv) Awarding the Relators all reasonable expenses necessarily incurred in prosecution this action, plus all reasonable attorneys' fees and costs, as provided by 31 U.S.C. § 3730(d);

B. On count III,

(i) Directing that Defendants cease and desist from violating the NYSFCA;

(ii) In the amount of three times the amount of damages which the State of New York has sustained because of Defendants' actions for each act of the Defendants in violation of the NYSFCA, as provided by N.Y. Fin. Law § 189(1)(g)(ii);

(iii) Directing that the Relators be awarded the maximum amount available under N.Y. Fin. Law § 190(6), awarding the Relators the maximum amount available under the NYSFCA for bringing this action, namely, twenty-five percent of the proceeds recovered in the action or in settlement of the action if the New York attorney general elects to convert the qui tam civil action into an attorney general enforcement action, or, if the New York attorney general does not elect to intervene or convert the action, thirty percent of the proceeds recovered in the action or settlement of the action;

(iv) Awarding the Relators all reasonable expenses that were necessarily incurred in prosecution of this action, plus all reasonable attorneys' fees and costs, as provided by N.Y. Fin. Law § 190(6)(b); and

C. All other appropriate relief for the United States, the State of New York, and the Relators.

**DEMAND FOR JURY TRIAL**

The Relators hereby demand trial by jury.

Dated: New York, New York
July 8, 2013

                                    McINNIS LAW

                                    By: _____
                                            Richard F. Bernstein
                                  521 Fifth Avenue, 17th Floor
                                  New York, New York 10175-0038
                                  Telephone: (212) 292-4573

                                  *Attorneys for Relators*